STATE OF CONNECTICUT *v.* PAUL PERIERE

SPEZIALE, C. J., HEALEY, PARSKEY, ARMENTANO and SHEA, Js.

Argued January 13—decision released April 6, 1982

*Bruce A. Sturman,* assistant public defender, with whom, on the brief, was *Jerrold H. Barnett,* public defender, for the appellant (defendant).

*Frank S. Maco,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant was charged with burglary in the first degree in violation of General Statutes § 53a-101 (a) (2) and unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a). The jury returned guilty verdicts on both counts and the defendant was sentenced to serve concurrent sentences of not less than ten nor more than twenty years and not less than two and one-half nor more than five years.

The jury could reasonably have found the following facts: On the morning of February 22, 1977, John and Martha Gulbenkian were asleep in the bedroom of their home in Fairfield. At approximately 6:30 a.m., the doorbell to the back door rang. Mr. Gulbenkian went downstairs to answer the doorbell while Mrs. Gulbenkian remained upstairs. Upon opening the door, Mr. Gulbenkian saw Tommy Watson, a messenger who worked for Mr. Gulbenkian's jewelry business at the Trumbull Shopping Park. When Mr. Gulbenkian opened the screen door to let in Watson, a man, whom Mr. Gulbenkian testified he had never seen before, came up from behind Watson and put a revolver to Mr. Gulbenkian's head, forcing him back into the house. Mr. Gulbenkian described the man as being five feet eight inches tall with a dark complexion and straight hair. He also noticed that the gunman spoke with a foreign accent or a lisp.

While holding the revolver in his left hand, the gunman ordered Mr. Gulbenkian into the living room. The gunman then tied up Mr. Gulbenkian

and Tom Watson. He covered Mr. Gulbenkian's head with a throw rug, put something in his mouth and secured the rug with electrical tape. The gunman threw Mr. Gulbenkian onto the floor and every couple of minutes someone would kick him in the shoulder. Mr. Gulbenkian could not see anything but heard someone else enter the house.

In the meantime, Mrs. Gulbenkian was still in bed on the second floor when she saw two men burst through the bedroom door. One man was tall with a bandanna tied around his face while the other man, armed with a revolver, wore a gold colored vinyl or leather jacket and sunglasses. The gunman threw a bedsheet over her head and tied her up. Mrs. Gulbenkian noticed that the gunman spoke with either a foreign accent or a lisp. Mrs. Gulbenkian could not see anything but heard the men rummaging through the house as they ransacked it.

Before the two men left, they told Mrs. Gulbenkian to tell the police that three black men had burglarized the house or else they would return and kill her. They gave Mr. Gulbenkian a similar warning. After the men had left, Mr. Gulbenkian managed to remove the rug from his head, and his wife, who had freed herself, helped to untie him. Mr. Gulbenkian went into the other room and untied Watson while his wife went next door to call the police.

When the police arrived, the Gulbenkians told them that Watson had been an overnight guest at their home. About a week later, Mr. and Mrs. Gulbenkian changed their story to reflect the truth and told the police that Watson had not been an over-

night guest, but had entered the house with the gunman. Both later testified that they had initially lied to the police because they had been ordered to say this and were afraid that the two men would return and kill them and because they originally believed that Watson was not involved in the robbery.

On appeal, the defendant basically presses two claims of error. First, he claims that the trial court erred in admitting into evidence certain testimony of the Gulbenkians. Specifically, he alleges that their statements, which explained why they changed that part of their story relating to Watson's status as an overnight guest, were irrelevant and highly prejudicial. Second, he claims that the court erred by failing to instruct the jury that testimony, admissible under the "state of mind" exception to the hearsay rule, could only be used for the limited purpose for which it was admitted.[1] We do not agree.

At trial, the prosecutor asked Mr. and Mrs. Gulbenkian why they had ultimately told the police that Tommy Watson had not been staying as a house guest on the night before February 22. Both Mr. and Mrs. Gulbenkian responded, over objection, by stating that, after the incident, the Fairfield police asked them to go to Stamford to identify a picture of Watson who, the police said, had been involved in another house robbery in Stamford. Upon learn-

---

[1] The defendant also claimed that by allowing the witnesses to explain away the inconsistencies in their stories on direct, rather than on cross-examination, he "was at a distinct disadvantage in keeping out irrelevant and prejudicial testimony." At oral argument, however, the defendant conceded that he could not claim that this procedure was improper. We therefore consider this claim of error, if it ever was a claim of error, abandoned.

ing this, the Gulbenkians felt that Watson was involved in the robbery of their own house and that they had been wrong in initially lying to the police.[2]

---

[2] Direct testimony of Mr. Gulbenkian:

"The Court: Mr. Gulbenkian, tell them exactly what you told the police.

"The Witness: I told the police, we called them up, they came at the house. I said, 'Officers, we did lie the first time. Tommy was not a guest.'

"Q. When you told that to the police, why did you tell them? What made you decide to tell the police that story?

"A. Because the police asked me to go to Stamford with them and verify another holdup. The same thing had happened on a house—

"Mr. Thim: I object and may that be stricken and may the jury be excused for a moment, please? . . .

"The Court: All right, ladies and gentlemen, would you just step down in the other room?

(The jury was excused) . . .

"Mr. Thim: Your Honor, at this time I would move, first, for a mistrial on the basis there has been mention of another holdup in Stamford which my client had nothing to do with and it's on the jury's mind now and I don't see how it can be stricken from their mind. [This motion for mistrial was denied.] . . .

"Mr. Thim: I would have a second motion and that be that the State be limited or prohibited to mention through this witness or otherwise any other crimes in Stamford or otherwise. Apparently, from what I gather standing here now, the prosecution is going to establish that my client was identified from photographs at the Stamford Police Department shown to him when they were investigating another crime. I object to that other crime being mentioned before the jury and I would move that any allusion or reference to that other crime not be mentioned before the jury.

"Mr. Maco: I think counsel is premature with regard to any objection he makes with regard to assuming the State will attempt to establish the defendant with regard to any other uncharged crime.

"The Court: If he went down the police station and looked at some photographs, you can do that by asking what happened when you went to the police station.

"Mr. Maco: We haven't even gotten to that point yet.

"The Court: All right.

"Mr. Maco: We haven't gotten to that point. All I am establishing now is why the change with regard to telling the police the first story with regard to Mr. Watson's being there, and the second

The defendant claims that this testimony was irrelevant and prejudicial because the fact that Watson was involved in similar crimes created an

story. The State, at this point, can't see any merit to counsel's curative instruction. Curative as to what?

"Mr. Thim: I am trying to prevent any evidence as to a crime in Stamford, and I would think hereafter, if any reference comes in as to a crime in Stamford, I think then I would have very good grounds for a mistrial.

"The Court: Make your objections as quickly as you can and I will try to rule on them.

"All right, bring the jury in.

(The jury was seated at 11:30 A.M.)

Continued direct examination by Mr. Maco:

"Q. Mr. Gulbenkian, I ask you again, the second time you spoke to the police, you gave them a second story with regard to Mr. Watson. Why did you now tell them that second story?

"A. The second story, because the police they wanted me to go to Stamford and, up there at the police station, they did show me Thomas Watson's picture saying that he's the one—

"Mr. Thim: I object.

"Mr. Maco: I don't want to know what they said.

"The Court: Sustained.

"The Witness: That's why I changed my statement, Sir.

"Q. Why?

"A. Because he was involved. I thought Tom was not involved.

"The Court: When you went to Stamford Police Station they showed you Mr. Watson's picture; is that right?

"A. Right, Sir.

"The Court: Okay, and that's why you changed your story?

"The Witness: That's why I changed my story."

Direct examination of Martha Gulbenkian:

"Q. What did you tell the police the second time you spoke to the police?

"A. I told the police that I was afraid of my life and that I was told that I would be killed because the robbers knew where I worked and where I lived and I told them that I had lied. Now, when I learned of the other robbery of the other jewelry—

"Mr. Thim: I object, your Honor, and may that be stricken and may the jury be excused for a moment, please?

"Mr. Maco: If counsel wishes the jury to be excused, by all means, he has the right.

"Mr. Thim: I would like to make a motion for mistrial. I earlier requested the Court to admonish the State's Attorney that no reference be made in this trial to such and such matters.

inference that a de facto conspiracy existed between the defendant, who was not charged with conspiracy, and Watson.

It appears that the court admitted this testimony into evidence under the "state of mind" exception to the hearsay rule.[3] "[W]e have recognized that a

"The Court: All right, I will excuse the jury.

(The jury was excused at 3:15 P.M.)

"Mr. Thim: Your Honor, Mr. Periere is on trial for one crime, two counts, in the Information. He is not charged with another robbery.

"The first State's witness had mentioned another robbery that somebody else had told them about. At that time, I jumped up, objected, and asked that it be stricken. When the jury was absent from the courtroom, I thereafter requested that the State be limited in its evidence to the extent that it not be permitted to introduce any evidence as to another robbery, as to other crimes. Now, your Honor did not make an order at that time, but I stated that my intention was known that I would request a mistrial if there was further mention of another robbery in this case. The State's Attorney was duly warned at that time. Now, there has been mention of another robbery. I don't know of any way a jury can forget that evidence. At this time I am sure that they feel that this man was involved in another robbery which is indelibly imprinted on their mind. The State's Attorney had due warning and I move at this time for a mistrial.

"Mr. Maco: If your Honor will recall with regard to the mention of the other robbery, it was again on the basis of why the change in story with regard to Tom Watson. There's nothing whatever indicating—

"The Court: All she had to do was say what she said to the police, really. She already testified it was because they told her what to say, that's the why.

"Now, Mrs. Gulbenkian, just say what you told the police, not what the police told you.

"The Witness: No, that's what I am saying, your Honor. I told the police the reason I changed my story was because I heard from the police that my husband—that Thomas Watson was involved in a robbery so he had to be involved in ours. Ours had to be set up."

[3] When Mrs. Gulbenkian testified, the following exchange occurred:

"Q. Why did you change the story to the police, the second time you told the story, about the status of Tom Watson in your house?

"A. Because Tom Watson was identified as the person who was involved in another robbery in Stamford of another jeweler and I

mental condition is a fact, that to establish it declarations of the party concerned tending to show what it was are admissible and that he may directly testify as to it." *State* v. *Savage,* 161 Conn. 445, 447, 290 A.2d 221 (1971); see *State* v. *Brokaw,* 183 Conn. 29, 32, 438 A.2d 815 (1981); *Levy* v. *Carter Rice & Co.,* 136 Conn. 216, 220, 70 A.2d 147 (1949); *Horowitz* v. *F. E. Spencer Co.,* 132 Conn. 373, 378–79, 44 A.2d 702 (1945) and cases cited therein; *Kovacs* v. *Szentes,* 130 Conn. 229, 231, 33 A.2d 124 (1943); McCormick, Evidence (2d Ed.) § 294; 6 Wigmore, Evidence (Chadbourn Rev.) § 1729. Under the state of mind exception, proof of declarations that tend to show fear may be received. See 2 Wigmore, Evidence (Chadbourn Rev.) § 394; 29 Am. Jur. 2d, Evidence § 650. The fear of the

---

realized then that he had to be involved in the robbery taking place in our home and we did wrong in lying for him.

"Mr. Thim: Your Honor, I object, and I think the answer clearly corroborates hearsay information.

"The Court: That's responsive. It really would bear upon her state of mind.

"Mr. Maco: That's correct. That's only what the State is attempting to do, state of mind.

"The Court: I will overrule the objection.

"Mr. Thim: May an exception be noted?

"The Court: It may be noted."

The record is not as explicit with respect to Mr. Gulbenkian's testimony but the court apparently felt that the "state of mind" exception would also allow his explanation as to why he had changed his story. After excusing the jury, but before counsel discussed the defendant's objection to this testimony, the court stated:

"The Court: Let me instruct the witness. Mr. Gulbenkian, you can only testify as to what you said to someone. You can't testify as to what they said because that's hearsay, you see?

"The Witness: I understand, Sir.

"The Court: And hearsay is not admissible. The jury is not supposed to hear that. So, when you testify, you should do it in light of: I said this to Officer so and so, I told Officer so and so that I did this and I did that and so on; all right, Sir? Do you understand that?

"The Witness: Yes."

consequences of plain speaking is a circumstance that may be utilized to explain away the effect of a witness' prior inconsistency by relating whatever circumstances would naturally remove the prior inconsistency. *United States* v. *Franzese,* 392 F.2d 954, 960 (2d Cir. 1968), vacated on other grounds, 394 U.S. 310, 89 S. Ct. 1164, 22 L. Ed. 2d 297 (1969), citing 3 Wigmore, Evidence (3d Ed.) § 1044, p. 737; see also *United States* v. *Pritchard,* 458 F.2d 1036, 1039-40 (7th Cir.), cert. denied, 407 U.S. 911, 92 S. Ct. 2434, 32 L. Ed. 2d 685 (1972); *United States* v. *Scandifia,* 390 F.2d 244, 250-51 (2d Cir. 1968), vacated on other grounds, 394 U.S. 310, 89 S. Ct. 1164, 22 L. Ed. 2d 297 (1969); *Commonwealth* v. *Carr,* 436 Pa. 124, 127, 259 A.2d 165 (1969). The statements concerning why the Gulbenkians had changed their version of the events relating to Watson's status as an overnight guest were properly admissible under this exception.

We now turn to the question of whether these statements, though otherwise admissible, were irrelevant or prejudicial to the defendant's case. " 'No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience. *Eason* v. *Williams,* 169 Conn. 589, 591, 363 A.2d 1090 [1975]; *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639 [1967].' *State* v. *Runkles,* 174 Conn. 405, 413, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978). We have noted that ' "[e]vidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in

connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issues. . . . *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639 [1967]; *Pope Foundation, Inc.* v. *New York, N. H. & H. R. Co.,* 106 Conn. 423, 435, 138 A. 444 [1927].'' *State* v. *Villafane,* 171 Conn. 644, 674–75, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977)." *State* v. *Gold,* 180 Conn. 619, 645–46, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); see *State* v. *Rose,* 168 Conn. 623, 636, 362 A.2d 813 (1975). "The ruling of the court was a discretionary one and '[t]he court has a wide discretion in its rulings on the relevancy of evidence.' " (Citations omitted.) *State* v. *Runkles,* supra, 413.

The Gulbenkians' testimony about their identification of Watson's photograph in Stamford was clearly relevant to their decision to tell the Fairfield police the truth about Watson's status in their house on the night before February 22, 1977. It tended to show that the Gulbenkians' second version of the incident was more truthful than the first because of the removal of their belief that they should protect Watson upon their discovery of his probable involvement in a similar robbery. In this respect, the testimony aided the trier in determining the credibility of the Gulbenkians and was admitted into evidence in the sound exercise of judicial discretion.

Once the relevancy of this evidence is established, our inquiry then focuses on whether the trial court abused its discretion in ruling that the probative value of the evidence outweighed its prejudicial

tendency. See *State* v. *Ryan,* 182 Conn. 335, 337, 438 A.2d 107 (1980). The trial court has a duty to exclude evidence which, "if admitted, would have a greater prejudicial than probative effect." *State* v. *Mastropetre,* 175 Conn. 512, 521, 400 A.2d 276 (1978); see *State* v. *Barlow,* 177 Conn. 391, 393–94, 418 A.2d 46 (1979); *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973) and cases cited therein.

We conclude that the defendant cannot establish any prejudicial impact upon his case resulting from the admission of this testimony into evidence. "Where a claim of an erroneous evidentiary ruling is raised on appeal, it is fundamental ' "that an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." *Casalo* v. *Claro,* 147 Conn. 625, 630, 165 A.2d 153 [1960].' *State* v. *Mahmood,* 158 Conn. 536, 541, 265 A.2d 83 (1969)." *State* v. *Dolphin,* 178 Conn. 564, 572, 424 A.2d 266 (1979); see *State* v. *Grimes,* 154 Conn. 314, 321–22, 228 A.2d 141 (1966). It is mere speculation to assume that the jury would infer from the Gulbenkians' testimony, without more, that Watson and the defendant were engaged in a conspiracy.[4]

Although the defendant concedes that his claim on the admissibility of this evidence is based on evidentiary rulings, making it incumbent upon him to establish that they were erroneous and probably harmful to him; see *Casalo* v. *Claro,* supra, 630; he also argues that their prejudicial impact deprived him of a fair trial. We do not agree. The testimony

[4] The record discloses no other evidence which would link Watson to the defendant and, in fact, when asked, upon cross-examination, the defendant denied that he knew Watson.

claimed to be harmful to the defendant referred to "other criminal conduct" of Thomas Watson, not the defendant. If, however, arguendo, it could be said to have referred to the defendant, we must still reject such a claim.

The general rule is that evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749 (1979); *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368 (1970); *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399 (1960). However, just because such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. In fact, "it has been said that there are so many exceptions to the rule that it is difficult to determine which is more extensive—the rule or its acknowledged exceptions." *State* v. *Holliday,* supra. Its admission, where material and relevant, invokes a balancing test involving the exercise of judicial discretion as to whether its prejudicial tendency outweighs its probative value. *State* v. *Turcio,* supra, 129; *State* v. *Holliday,* supra, 173; see *United States ex rel. Bibbs* v. *Twomey,* 506 F.2d 1220, 1222–23 (7th Cir. 1974); *United States ex rel. Harris* v. *Illinois,* 457 F.2d 191, 198 (7th Cir. 1972); 6 Wigmore, Evidence (Chadbourn Rev.) § 1904. "Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." *State* v. *Turcio,* supra, 129. The rule of admission of evidence of other crimes is a rule of evidence and not a rule of constitutional law. *Ramsey* v. *State,* 239 Md. 561, 564, 212 A.2d 319 (1964); *State* v. *Pack,* 18 Ohio App. 2d 76, 82, 246 N.E.2d 912 (1968).

"Generally, however, the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." *United States ex rel. Bibbs* v. *Twomey,* supra, 1222; *Grundler* v. *North Carolina,* 283 F.2d 798, 802 (4th Cir. 1960). "The test for determining whether a defendant's constitutional right to a fundamentally fair trial has been violated by the admission of evidence of other crimes is the same as would be applied by a reviewing court on direct appeal in determining whether the admission of such evidence was within the permissible exercise of discretion of the trial court." *United States ex rel. Bibbs* v. *Twomey,* supra, 1223; *United States ex rel. Harris* v. *Illinois,* supra, 198. We have examined the entire record and cannot conclude that the trial court's rulings on the evidence resulted in denying the defendant a fair trial.

The defendant's second claim of error relates to the court's charge to the jury. He alleges error in the court's failure to instruct the jury that the portion of the Gulbenkians' testimony admitted under the "state of mind" exception to the hearsay rule could only be used for the limited purpose of assessing the Gulbenkians' credibility.

It does not appear from the record before us that the defendant either requested the court to charge the jury as described or that he took an exception to the charge on this basis. See Practice Book § 3060F (c) (1), (2). "Where this failure occurs, there is no error in not making the charge. See *State* v. *Morgan,* 170 Conn. 110, 112, 365 A.2d 99 (1976); *State* v. *Gerak,* 169 Conn. 309, 316, 363 A.2d 114 (1975)." *State* v. *Boyd,* 178 Conn. 600, 605, 424

A.2d 279 (1979). The defendant has presented us with no reason to disregard this rule, and our review of the record discloses none. See *State* v. *Evans,* 165 Conn. 61, 67, 327 A.2d 576 (1973).

There is no error.

In this opinion the other judges concurred.